HARRISON *et al. vs.* THE COTTON STATES LIFE INSURANCE COMPANY *et al.*\*

The voluntary bond tendered by defendants, after the hearing of the application for injunction and receiver and before the decision of the chancellor was rendered, was not properly a part of the case as cause shown against said application, and was not an adequate substitute for injunction and receiver.

January 14, 1887.

Insurance. Corporations. Injunction and Receiver. Bonds. Practice in the Supreme Court. Before Judge SIMMONS. Bibb Superior Court. October Term, 1886.

On the 16th day of June, 1886, plaintiffs in error, for themselves and all others having an interest as policy-holders or as creditors of the Cotton States Life Insurance Company, and who might become complainants, presented their bill to the chancellor, praying for an injunction, the appointment of a receiver, and for general relief. They state that they are policy-holders of that company; that

---

\*This case was argued at the last term, and the decision reserved.

in consideration of the payment of the premiums required in their respective policies, the company agreed and contracted to pay to the beneficiaries named therein the full amount of said policies, less the indebtedness of the insured to the company, within sixty days after proof of the death of the insured, or at a date therein mentioned, should the insured be then in life; that the company, by its agents, procured insurance by representing that no deduction from the amount of its policies would be made, except the balance of the then current year's premium, if any should be due, and all notes or credits for premiums thereon, and no interest on said notes or credits for premiums would be so deducted; that by the payment of only a part of a premium (about one-half) insurance would be greatly cheapened, because no interest on credits for premiums would be charged; that the company has repudiated its contracts so made, and now claims the right to charge interest on all credits for premiums; that if such claim be allowed and interest be charged on each annual credit for premiums, the insured would become largely indebted to the company above the amount of his policy, before the time fixed for its payment and before his death, calculated according to the ordinary tables of life expectancy; that all such policies would become burdens instead of benefactions; that the co-defendants, who are controlling and managing the affairs of the company, have colluded and confederated to discredit the company, to depreciate the value of its policies, to buy all of them at a price greatly less than their real value, and then to divide among themselves the assets of the company; that their scheme is fraudulent, and in pursuance thereof they have asserted and made known to policy-holders the unjust and illegal claim to interest on all credits for premiums, have withdrawn their agents and have discontinued the business of insurance; that for more than a year they have failed and refused to make the

reports to the governor and comptroller-general of the State, which are required of all insurance companies by the laws of this State; that in the reports previously made, their statements were deceptive, did not indicate the true condition of the company, and were so arranged as to deceive and mislead; and that in furtherance of their fraudulent scheme to so discredit the company as to enable them to buy its liabilities at nominal prices and then divide its assets among themselves, the president of the company and his confederates are seeking to withdraw certain bonds deposited with the comptroller-general for the security of policy-holders, as a condition precedent, under its charter, to the right of the company to begin the business of life insurance, and to substitute therefor other securities of less and of fluctuating value. Complainants charge, on information and belief, that the company is insolvent, and say that if its president and his confederates be allowed to continue in the management of its affairs, its assets will be disposed of and placed beyond the reach of creditors long before many of its outstanding policies have matured. Discovery was waived, except as to matters especially inquired about, to-wit:

1. What policies of insurance were issued in 1885 and 1886?

2. How long has the president of the company been in office, how much stock did he subscribe for and how much cash has he paid on account of his subscription

3. How many policies of the company have been bought within the past three years by either of the defendants? How much in premiums had been paid on each policy so bought, and what was paid therefor?

4. What policies are outstanding? What is the amount and value of each?

5. Who are stockholders in the company? Who were subscribers to its stock, and how much has each subscriber paid on his subscription?

6. Are any of the officers or stockholders of the company indebted to it? If so, how much and for what? How much money has each stockholder and officer received from the company within the last three years, and for what?

7. What are the assets of the company? In what do they consist? Where located, and in whose possession are they?

On this bill, the chancellor granted an order requiring defendants to show cause why the prayers of complainants should not be granted.

On the 17th of June, 1886, complainants amended their bill and alleged that the company, by failing to make reports to the governor and the comptroller-general in the year, 1885 and 1886, as required by section 2843 of the code of Georgia, forfeited its rights to transact any business of insurance; that notwithstanding its forfeiture of all right to transact any business of insurance, and without the license required by law for that purpose, defendants are receiving and disbursing the assets of the company, collecting premiums and buying policies; that because of said forfeiture, the company not having authority to carry on any other business, its assets become and are trust funds for the benefit of creditors and policy-holders; and for the custody and distribution of said assets a receiver should be appointed; that defendants are persistent in their efforts to withdraw certain of the bonds deposited with the comptroller-general for the security of policy-holders; and that should they succeed, said bonds would be converted by the defendants to their own use, and the security of policy-holders would be thereby greatly impaired.

Pursuant to a prayer in the amended bill, the chancellor, on the 23d of June, 1886, granted an order restraining defendants, until the hearing, from collecting certain premiums and from disposing of any of the assets of the company.

On June 26, 1886, defendants were served with a notice to produce certain books, which it is unnecessary to enumerate here.

The answer of defendants states that the premiums charged for the policies of said company were based on a table of rates, which is substantially the same as those used by leading life insurance companies of the United States; that the entire premium charged was an amount of money equivalent, according to the mortality tables commonly used, to the risk to be carried; that the loan of a part of the premium was for the convenience of the policy-holder, and all such loans bore interest at the rate of interest prescribed by the laws of Georgia; and that only one year's interest on one year's loan is collected at the commencement of each year, and the balance of interest is collected at maturity of policy. Defendants deny the charge of an intention on their part to render the policies of said company valueless, and deny all charges of collusion and confederation. They deny that they have done anything to discredit the company, and say that, on the contrary, they have represented it to be entirely solvent. In answer to the charge that the company had discontinued business, and had failed to make reports to the governor and comptroller-general as required by law, the defendants say that, at a stockholders' meeting, held April 7, 1885, a resolution was passed to discontinue business, and a committee was appointed to wind up its affairs by securing re-insurance on all of its policies, but said committee had been unable to do so upon satisfactory terms; that on the 16th of October, 1885, the directors of the company, by a resolution, authorized said committee to purchase or re-insure the policies of the company, and under this authority, 199 policies had been bought, but no director, officer or agent of the company had been interested in the purchase of any policy. Defendants say that the semi-annual report to the governor for July, 1885, was

not made for want of blanks usually furnished by the comptroller-general; that said blanks were received on the 3rd or 4th of September; that the secretary, with the assistance of the vice-president and a director, prepared the report, which was by the secretary mailed, addressed to the comptroller-general, but the same was never received; and that the report for January, 1886, was prepared and tendered, but was refused on the ground that no report was made for July, 1885. With reference to the charge in complainant's bill that defendants had attempted to withdraw certain bonds from deposit with the comptroller-general, the defendants say that among the securities so deposited are $27,500 State of Georgia 7 per cent. bonds, due July, 1886; and that the comptroller-general was requested to collect these bonds and invest the amount in 6 per cent. debenture certificates of the Central Railroad, but this he declined to do, and said bonds remain in his custody.

Defendants say the company is solvent; that its assets amount to $331,734.08, and that $156,177 invested at six and a half per cent. or $182,798 invested at four and a half per cent. would pay all the liabilities of the company as they mature. They enumerate three items of assets, which they say are more than sufficient to discharge their liabilities. These items are as follows:

| | |
|---|---:|
| Estimated value of securities deposited with the comptroller-general, . . . . . . . | $110,000.00 |
| Accumulated loans, . . . . . . . . . . | 88,487.00 |
| Interest on same, . . . . . . . . . . | 40,010.92 |
| Aggregate, . . . . . . . . . . . . | $238,497.92 |

They say that the officers and directors of the company are incapable of such frauds as the conversion of its assets to their own use, and that their character for financial integrity and honesty is a sufficient refutation of such charge; they say it is their intention to retire all outstand-

v 78 46

ing policies by purchase or re-insurance, and that when this is done, they will ask for the return of the bonds deposited with the comptroller-general, and for authority to wind up the business of the company and to pay to stockholders balance of capital then on hand. · They deny that they contracted with any policy-holder not to charge interest on loans or credits for premiums, and say that the business of insurance so conducted would result in a total loss of the capital stock of the company; that no insurance company ever made such contract; and that other companies require annual payment of all interest on loans, but this company required the annual payment only of one year's interest on one loan, and collected the balance of interest on all the loans at the maturity of the policy. The company denies all intention and effort to depreciate the value of its policies to enable it to buy them at nominal prices; it denies that its reports to the governor and comptroller-general have been deceptive, or that its affairs have been managed except by its officers and directors in the manner authorized by its charter, and denies every charge of collusion.

It says that W. B. Johnston has given his services to the company without compensation; that he has never received any money from the company except the loan of $5,000, in March 1, 1877, for which he gave his note, payable on call and secured by bonds of the Central R. R. and Banking Company, and this loan was paid within a short time; that said Johnston has given to said company its office rent since April 7, 1885; and that since July 11, 1885, the secretary has been its only salaried officer. It says that when the deficiency of $57,100 in the cash of its former secretary, Mr. Obear, and his two notes of $6,000 were discovered, its stockholders determined to wind up its business; that it will not lose more than $30,000 by the default of Mr. Obear; and that it is able to stand such a loss.

In response to interrogatories, it says :

1. That no policies have been issued in 1886.

2. That twelve policies were issued in 1885.

3. That W. B. Johnston is and has been its president since its organization in 1869; that he holds 150 shares of its stock; that he subscribed for 250 shares, and has paid on account of his subscription $7,500.00; that he has sold 100 shares; and that he has never bought any other stock of the company.

4. That since the fall of 1885, it has bought 199 policies, as appears from list of said policies attached to answer and marked exhibit B. For further answer to this interrogatory, complainants are referred to the books of the company, and it is stated that the president and secretary of the company will direct the attention of complainants to the books containing the information desired.

5. That outstanding risks amount to $551,100.00. Of this, 92 policies cover $267,100.00, upon which premiums are being paid, and 580 policies cover $284,000.00, which are termed "paid-up policies," and upon which no premiums are being paid. A list of all outstanding policies is attached. For further answer to this interrogatory, complainants are referred to the books of the company.

6. That a list of stockholders is attached.

7. That no officer or stockholder is indebted to the company, except for unpaid subscription, which has not been called for, and for $28,853.00 of a 13 per cent. call not yet met; that during the years 1884, 1885 and 1886, W. B. Johnston received no money from the company; that on January 1, 1884, there stood to his credit $2,905.43, and on July 1, 1884, he was charged with $75.73 for premium on his policy; and that nothing has been paid to any stockholder during the years 1884, 1885 and 1886.

8. That the assets of the company are as follows:

Western Railroad Company of Alabama bonds, $45,000 00
State of South Carolina bonds, 6 per cent. . 31,500 00
State of Georgia bonds, 7 per cent. . . . . 27,500 00
Mechanics' Building and Loan Association stock, 1,900 00

| | |
|---|---:|
| Real estate in Alabama, | 6,500 00 |
| Real estate in Georgia, | 10,000 00 |
| Real estate in South Carolina, | 1,000 00 |
| Real estate in Bartow county, | 4,500 00 |
| Deficiency of Geo. S. Obear, | 63,100 00 |
| Premium loans, | 88,487 00 |
| Interest on loans, | 40,010 12 |
| Balance due on call of 13 per cent. of stock subscriptions, | 28,853 00 |
| Cash on hand, | 1,595 25 |
| Total, | $349,945 37 |

The expenses of the company are now only about $1,700 per annum. In response to the amended bill, the answer says it is true it has received no license to do business in 1886, but says such license should have been issued, because the failure to make the semi-annual report of 1885 was not the fault of its officers, but because of the failure of the comptroller-general to furnish them with the necessary blanks, as before stated, and the report required for January, 1886, was tendered but refused; that the failure to file said reports did not forfeit the right of the company to do business, as charged in the bill; and that since it has been without license, it has issued no policies, but has collected premiums, paid losses, and with intention to wind up its business had bought policies. The denial of any intention to fraudulently dispose of the assets of the company, and of persistent effort to withdraw the securities deposited with the comptroller-general, is repeated; and the answer concludes with a declaration by W. B. Johnston, the president of said company, that for the honor of the State of Georgia, and of the city of Macon, and for the preservation of his own good name and character and that of his associates, said company shall not fail to meet all of its obligations; that he and his associates could not afford the disaster of such a failure; and that said company is now solvent, and that they intend to keep it so if not deprived of its management.

At the hearing, complainants amended their bill as follows: That the charter of said company was granted by the legislature of Georgia, October 7, 1868; that by said charter it was provided, as conditions precedent to the right of said company to organize and begin business under said charter, that its capital stock should be $500,000; that $200,000 in cash should be actually paid in, and that $200,000 in good and solvent bonds or stocks, to be approved by the comptroller-general, should be deposited with him as security for policy-holders; that by an amendment to said charter, approved February 10, 1869, the amount of cash required to be paid in and the amount of securities required to be deposited with the comptroller-general was each reduced to $100,000, on condition that the *bona fide* subscriptions to its capital stock should amount to $500,000; that by the terms of its amended charter, it was essential that said company should have and maintain *bona fide* a capital stock of $500,000; that it never did have *bona fide* a capital stock of $500,000; that if upon its organization the subscriptions to its capital stock appeared to aggregate $500,000, a part thereof was not *bona fide* and was obtained merely to effect an organization; that after organization, subscribers were released from their subscriptions and the capital stock of the company reduced below the minimum amount, to-wit, $500,000, required by its charter, and therefore, that the business of said company from its inception has been illegal; that since its organization, notwithstanding the said requirement of its charter and in disregard thereof, it has continued to reduce its capital stock until it now has only $289,900, but little more than 50 per cent. of what is required by its charter; and that such reduction of its capital stock was not only illegal, but operated as a fraud on policy-holders, who insured and paid premiums on the faith of such capital stock.

Complainants specifically allege that on December 11, 1871, Y. G. Rust, who had subscribed for twenty shares of the stock of said company, was released from all liability,

his stock cancelled, and in consideration thereof was given a paid-up policy for $5,000.00, whereby in a single transaction the liabilities of said company were increased and its capital stock reduced; that on January 20, 1872, John King, who had subscribed for fourteen shares and was liable to the full extent of the par value thereof, to-wit, $1,400.00, was allowed to surrender his stock and was released from all liability on his subscription therefor; that J. L. Mustin was released about the same time from liability on his subscription for fifty shares of said stock; that many other subscribers were likewise released, among them, S. D. Head fifty shares, David Flanders one hundred shares, and Peter Solomon fifty shares; that notwithstanding the reduction of its capital stock far below the minimum amount required by its charter, the company, through its officers and agents, and by written and printed statements, circulars and advertisements, represented at all times, up to 1884 or 1885, that it had a capital stock of $500,000 as a guarantee for the security of its policy-holders; that such representations were made to induce confidence, and that they were false and intended to deceive and mislead, and did mislead and induce policy-holders to insure in said company, and as to them was fraudulent.

Complainants further charge that the officers of the company, who controlled and managed its affairs, borrowed its moneys and used the same for their personal benefit, contrary to their duty as trustees; that large deficits had occurred for money so used and the rights of policy-holders have been greatly endangered thereby. The charge of insolvency is repeated, and complainants say that if the nature of the assets of said company, as shown in its answer, be considered, the fact will become apparent that it has no *bona fide* surplus; and that in its effort to show solvency, a schedule of its assets is made in its answer, and that in that schedule appear the following large items: Accumulated loans, $88,487.00; interest on same, $40,010.92. Complainants say that both of these

items are disputed by many policy-holders, who deny their liability either for the loans or interest thereon, and in no event should these items be considered as assets to show solvency as set out in the answer, because by the answer the claims of policy-holders are reduced to what defendants say is their present valuation, which in many cases would be less than the amount claimed as loans and interest. In the said schedule of assets is included certain real estate in the city of Atlanta estimated at $10,000. Complainants say said land is not in the possession of said company, but is held adversely to it by parties who claim title to it, and that litigation in respect thereto is now pending. In said schedule is an item called "deficiency in cash of Geo. S. Obear, for which company holds collaterals, $63,100." It is admitted that these collaterals are not worth more than $30,000. The desperate effort of defendants to show the solvency of said company is made apparent by inserting in its schedule of assets this item at $63,100. Complainants charge that this deficiency occurred, in part at least, with the knowledge and consent of the president of said company, and that he and his associates, by the slightest diligence, might have known as to all of it, and that they are at least guilty of gross neglect. Complainants further say that the item of $28,855, unpaid balance of an assessment of 13 per cent. of its stock, should not be considered as an asset to show solvency of the company, because it cannot be collected by law, other subscribers having been illegally released from liability on their subscriptions; that the charge made in the original bill, that defendants had confederated for the purpose of depreciating and buying the policies of said company at nominal prices, is confirmed by the answer, which shows that over $200,000 of its policies have been bought at about 10 per cent. of the same; and that said scheme has not been abandoned, but in order that they may fully execute the same, they have, since the filing of this bill, by letters and circulars addressed to individual

stockholders, misrepresented the object and purpose of complainants, and have sought thereby to prevent policy-holders from being made parties complainant and to induce them to become parties defendant to said bill.

Defendants answered the amended bill. They say that the original subscriptions to the capital stock of said company amounted to $534,700; that Y. G. Rust owned 20 shares, on which he had paid $33 per share; that he was unable to pay his premiums, and that on the 11th of December, 1871, the company took his stock for his premiums, allowing him therefor $22.13 per share. The John King Bank, of Columbus, became indebted to the company on account of collections made for it, and failed; John King, the proprietor of said bank, owned 14 shares of the company's stock, upon which he had paid $33 per share, and on the 20th of January, 1872, the company took this stock at $33 per share on account of said indebtedness of said bank. James M. Bivins, an agent of the company, became indebted to the company on account of collections, and was insolvent. John L. Mustin owned 50 shares of the company's stock on which he had paid $33 per share, and the company took this stock, on account of Bivins' indebtedness, at $33 per share January 20th, 1872. M. L. Napier became indebted to the company for money loaned to him on 30 shares of the company's stock as collateral security; he became insolvent and the company took his stock at $13.33 per share, he having paid on said stock $33 per share. J. W. Burke became indebted to the company as general agent for money advanced to him, and for collections made by his sub-agents, and on account of this indebtedness, said Burke on March 4, 1875, transferred to the company 74 shares of its stock at $7 per share; the balance of his indebtedness to the company was paid by April, 1883, by crediting him with commissions to which he was entitled. W. J. Magill, superintendent of agencies of the company, became indebted to it and was insolvent, and on account of this indebtedness,

the company accepted a transfer of 18 shares of its stock, December 31, 1877, at $14.83 per share. On this stock $37 per share had been paid in. On December 27, 1880, the company accepted the transfer of 30 shares of stock from J. G. Bailey at $37 per share, the amount paid in thereon, in settlement of a note for $1,110 for borrowed money, Bailey being insolvent. On December 30, 1882, 25 shares were transferred to the company at $37 per share by Johnston in settlement of indebtedness to the company for borrowed money, Johnston being insolvent. On February 28, 1885, D. Flanders transferred to the company 300 shares, at $8.42 per share, on which $37 per share had been paid in, in settlement of a note for $1,700.94 principal, and $800.18 interest, Flanders being insolvent. On January 5, 1882, 50 shares of stock were transferred to the company by J. M. Green, at $11.62 per share, on which $37 per share had been paid in, in settlement of indebtedness to company of $581.18 for borrowed money, Green being insolvent.

Defendants further say that they were advised by Col. L. N. Whittle, counsel of the company, that the company had authority to buy its stock, and that it has in good faith bought its stock whenever it was offered below its intrinsic value; that the stock so bought is held as assets and can be sold as other assets of the company; that from January 30, 1873, to January 16, 1886, the company had bought 1,159 shares, paying therefor from $20 to $4 per share; and that these purchases were made for the benefit of such stockholders as might stand by the company. They say that 20 per cent. of its stock was called in on the organization of the company, and ten per cent. on December 28, 1869; that three dividends aggregating 7 per cent. were declared and credited on the stock, and that 13 per cent. was called for February 19, 1886, which, when paid, will make 50 per cent. to credit of subscriptions. They reaffirm that the company is solvent, and make another schedule of its assets aggregating a cash valuation,

not including interest on loans, $295,013.01. They say that the officers of the company, whose good name and financial standing are involved, are managing the affairs of the company wisely and economically, and if not interfered with will pay every policy at maturity and save something for stockholders who stand by the company; and that they recognize their fiduciary capacity and will faithfully discharge the trust.

At the hearing, about fifty other policy-holders were made parties complainant, and about eighty appeared by counsel representing the company and were made parties defendant to protest against the waste which they believed would result should the relief prayed for by complainants be granted. Seven other policy-holders appeared by R. K. Hines, Esq., and were made parties defendant. They say that the company is dead beyond resurrection, and ask that an expert in life insurance be appointed to ascertain and report the present value of each outstanding policy, and that this be done without delay. They object to the appointment of a receiver on account of expense, and say they are willing to trust the officers of the company.

It is unnecessary to set out the evidence.

After argument had, the court made and rendered the following decision :

Z. D. HARRISON *et al.*  
*vs.*                                } Bill for injunction, etc.  
THE COTTON STATES LIFE INSURANCE Co. *et al.*

The above stated case came on to be heard before me, after various orders of postponement shown by the record, on the 2nd day of October inst. upon the bill and the amendments thereto, the answer and the amendments thereto, and the affidavits and other proof submitted by both sides. The decision on the application for injunction and the appointment of a receiver has been held up for consideration until the present time.

Intermediate between the hearing of the application and the decision hereby made, defendant, The Cotton States Life Insurance Company, voluntarily tendered its bond, with good security, conditioned to pay to the complainants and such others as may be made parties to said bill, the amount which may be adjudged to be due them under their respective policies after the assets of the company shall first have been exhausted for the payment thereof, which bond has

been filed in the office of the clerk of this court, and which is by this reference made a part of the record.

I hold and decide in reference to the following principal questions made in the case:

First. That there has been no misconduct on the part of the corporation, such as requires that the management of the corporate affairs should be withdrawn from their control.

Second. That the failure of the company to procure license from the State does not of itself warrant the appointment of a receiver to take charge of its affairs. Such failure does not prevent the company from taking care of its assets and from receiving the premiums due on the policies already issued. Its effect is to prevent the company from issuing new policies or taking new business in this State, and does not work a forfeiture of the corporate franchise.

Third. I hold and decide that the defendant, "The Cotton States Life Insurance Company," is, under the evidence, a solvent corporation, and that the facts, especially in view of the tender of the bond already referred to, do not warrant the appointment of a receiver upon the ground of insolvency.

Fourth. I hold and decide that the company commenced business with a sufficient amount of *bona fide* subscribers, and a sufficient amount paid in in accordance with its charter and amendment thereto.

Fifth. I hold and decide that the defendant, under its charter, had a right to purchase its policies.

Sixth. I am in some doubt as to whether the words in the charter, "and other obligations," following the words, "have power to purchase its policies and scrip," would authorize the defendant to purchase its stock or not;—whether it does or not, under the facts in this case, I do not think that a receiver should be appointed, because the company has decided to go into liquidation, and the resolution appointing Messrs. Johnston, Baxter and Burke to wind up the business does not give them the authority to purchase stock, and they have sworn in their answer that they do not intend to purchase any more of the stock. If they should do so, the bond alluded to above, in connection with the assets, is sufficient to protect every policyholder.

It is therefore ordered and adjudged that the prayers of the complainants' bill be denied, and the application therein for an injunction and the appointment of a receiver be and the same is hereby refused, and all temporary restraining orders heretofore granted are hereby revoked. It is further adjudged that, whereas various interlocutory orders and injunctions have been granted against The Cotton States Life Insurance Company, restraining it from collecting the premiums due by certain of the policy-holders, the complainants in whose behalf said restraining orders were obtained shall

have tewnty days from the date hereof within which to make payment to said company of the amount of said premiums.

Let this order and judgment be entered on the minutes of Bibb superior court by the clerk thereof.    October 20, 1886.

T. J. SIMMONS, J. S. C.

To this the complainants excepted.

R. F. LYON; HARRISON & PEEPLES; E. K. LUMPKIN; J. H. LUMPKIN, for plaintiffs in error.

CLIFFORD ANDERSON · HENRY JACKSON ; HILL & HARRIS, for defendants.

HALL, Justice.

It is considered and adjudged that the chancellor erred in permitting the voluntary bond described in the record to become a part of the case as cause shown against the prayer for injunction and receiver, said bond not being an adequate substitute for injunction and receiver.   And having incumbered the exercise of his discretion with this document, he erred in denying the injunction under its influence.   Let the judgment be reversed and the application for injunction and receiver be heard *de novo*, unless the defendant corporation will enter into bond with good security in the sum of $200,000, conditioned to pay whatever recovery may be had on final decree in this cause in favor of any and all persons who shall be parties thereto when such decree is rendered.

In case such bond, with security satisfactory to the chancellor, should be tendered at a time to be fixed by him, let the same be accepted, and thereupon let the judgment denying the injunction and receiver stand affirmed.

In either event, however, let the cost, both in this court and in the court below, on the present writ of error be paid by the defendants in error.

Judgment reversed on terms.